The case we're going to hear is Smedley v. Smedley and Mr. Humphrey. Good morning and may it please the court. My name is Jason Humphrey and I'm here on behalf of Mr. Mark Smedley, who is the respondent in the underlying Hague petition and the appellant in this matter. For matters of simplicity, I will refer to Mr. Smedley as the father and Mrs. Smedley as the mother. The Ninth Circuit case has stated in Avesta that to achieve the uniformity of application across countries, upon which depends the realization of the Convention's goals, courts must be able to reconcile their decisions with those reached by other courts in similar situations. The idea behind the Hague Convention was to establish a level playing field and one playbook for all of the contracting states that participated in the Hague. As such, each contracting state is bound by the Articles of the Treaty, the first of which, Article III, the most important, says that if a child is wrongfully removed or retained in a country and that retention or removal is against custody rights of a parent from the habitual resident state or the removed state, then that removal is wrongful and the child must be returned under Article XII. Article XIII sets aside a few exceptions to the return rule and several of those we take issue with. One of them was applied in this case. Correct, Your Honor. And your argument is, I guess, they didn't go through Section Article III, they went right to the Affirmative Defense. Yes, Your Honor. And I guess the question is, is there a case we have that says you have to go through Article III when you're going to decide on Affirmative Defense that it doesn't, they can concede hypothetically that Article III might entitle you to win, but then there's Affirmative Defense of consent. That's the whole case, isn't it, really? The legal case. You're also challenging comedy. Correct. Whether we afford a comedy to a German court that found the facts. Correct. Our underlying argument is the extension of comedy by the district court on what we contend is a flawed German court Hague analysis and finding. To go back to your first question, I do not have a case that says that you are required to. However, the case law dealing with the Hague Convention as well as the Hague Convention itself would dictate that you must find habitual residents or make a determination of habitual residents to establish which set of laws of custody would. . . Let's assume you're right. It seems to me what the court was saying is that regardless of the residence of the children, the parents consented to the removal to Germany. And why isn't that just traditional jurisprudence? You don't have to decide every issue. If they concede that you win your position under Article 3, where you assert the child's residence, they're saying, nonetheless, Mark consented to the children going to Germany. And that's just a normal jurisprudential approach. Now, you can challenge whether factually consent was demonstrated, and you have argued that. But I'm not sure why we would have to go through Article 3 if it's not meaningful. Well, under the fact that you stated, Your Honor, I would agree with you. However, the German court didn't make that analysis. What they did was a muddy dichotomy of an Article 3 determination that wasn't an Article 3 determination. They went as far as to say, we're not going to determine habitual residents of these children. We're going to leave that open. Then they afforded Article 13 protections to the children. Not just affirmative defense, isn't it? And basically, if the parents consent, the finding under Article 3 doesn't matter. But it does, Your Honor, because Article 13 says if you find a wrongful removal, and they have to go back under Article 12, Article 13 applies to affirmative defenses. But to get to the affirmative defense stage, the court would have to have found a wrongful removal in the first place. How are you harmed by that? I mean, let's assume that, as we do in qualified immunity analysis all the time, that we'll assume for purposes of deciding that the habitual residence is, as you argue. But it still doesn't prevail because of its finding as to consent. How does that negatively affect your argument? Well, it leaves my client with no available remedy. The German court determined that they were not going to decide habitual residence. Let's just take it the way Judge Duncan was just saying. Let's say you're arguing for, what, North Carolina habitual residence? Correct, Your Honor. Okay. So let's say the German court said, we conclude that the habitual residence of the children is North Carolina. But we find, as a fact, that Mark consented to their removal to Germany. Now, would you have any objection to that? No, Your Honor, I would not. Well, I don't understand the difference. It's not meaningful to require, to tell a court to find habitual residence when it's insignificant to its ultimate conclusion. Well, let me take it a step further on your argument. Not an argument. I'm just asking questions about hypothetical stuff. Forgive me. Yeah. Our statement was that even if we were to assume that the court was not required to make an Article III determination before enacting the affirmative defense, the German court still contradicted itself and its findings because it said they weren't going to determine habitual residence. They were going to leave that open. And it also said in its findings that the Hague petition wasn't proper under the Hague petition, that it had no place under Article III. That was in the first sentence of the very last paragraph of the Bamberg Court's ruling. So our contention is, if my client has filed a Hague petition that is not proper under the Hague, yet they give Article XIII affirmative defenses to the children, what remedies does my client have in order to pursue the protections that the Hague Convention is alleged to provide? He has no forum in which to pursue. Let's assume everything is done perfectly the way you argue. It doesn't advance the ball if the court found correctly that Mark consented to the removal of the children to Germany. In other words, if Mark consented, your winning is nothing because he consented to the removal of the children to Germany, and that's all the Bamberg Court decided is, are the kids properly there, should we return to the United States? And Bamberg Court said, Mark consented to the children coming here. The rest of it is irrelevant. We'll leave it open. That's just sort of the way we decide cases, isn't it? Well, Your Honor, that can't be possible because if you make a Hague application, there has to be a determination for the rights of the parties involved. Again, my client was left with no viable forum to pursue his parental rights in the recovery of his children. How can he get parental rights to get the children back if he consented to sending them over? Well, we contend he didn't consent. I understand. Isn't that, I think the point is, we're arguing or we're discussing something that's not ultimately dispositive. What the decision turned on that you challenge is consent, not habitual residence. So you might want to, I don't want to tell you how to use your time, but that seems to me to be. Well, if we were to assume that the first argument was irrelevant, then our consent argument is one of that. Actually, we can assume that you win. I'm perfectly willing to assume that the habitual residence is North Carolina, but you consented. We contend we did not. There was not enough evidence on record and the findings of fact to contend that Mark had consented. One of the issues that we took with the German court's findings was that there was a significant amount of findings of fact dealing with the party's marital discourse in as far back as seven years prior to the Hague application. Discord. I'm sorry, discord. And their disagreements, their marital relationship up to seven years prior to the Hague application. Our courts have been very clear in saying that that's an irrelevant finding of fact. That has no place in a Hague Convention application or in its ruling. That material has no bearing on the objective standards that a Well, it might give credibility to the discussion that took place in May, April, May, that spring, before Daniella went to Germany. She testified as to the circumstances under which she went to Germany, and she's basically discussing it against a background where there has been marital problems throughout about the location of children, where to live, who's going to deal. They just weren't getting along, I guess. But I don't know if that is material. The question is, I think, in affording comedy or not, we have to figure out what the standard is. I think comedy has some deference to the Bamberg court if it acted reasonably. And the question is in finding that Mark consented during those discussions in that spring and summer. And then, of course, she said, I'll think about it according to her testimony. Then she gets over to Germany and says, I've thought about it. I've decided, no, I'm going to stay, as I indicated before I left. The question, I suspect, is, is that enough factual finding to support consent? And was the court proper in finding that? Well, we would contend that it was not proper. That was not enough factual basis. But you have to find a little more, don't you? You have to find that. What is the standard we do? We're not reviewing the court. We're affording comedy. And we have to decide whether the court acted reasonably, right? Actually, Your Honor, quickly. There's a specific language. As per the very few cases that have dealt with comedy of a Hague application, they have stated that a court may properly decline to extend comedy if they find the foreign court's determination clearly misinterpreted the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness. We would contend that the lack of evidence in this fact that there were allegations or conclusions drawn from the evidence that was presented that he must have consented. There was no actual evidence that he said, yes, you may go to Germany permanently. In fact, again, our evidence and our argument was that she testified that she hadn't even made up her mind yet whether she was going to stay. So how could the father have consented to a decision that hadn't been made yet? And based on that, at a minimum, that would be well below the reasonable standard of reasonableness for findings in that. If the court found that the testimony of—properly found that the testimony of Daniela given, and that's quoted in the opinion and was correct, is that evidence enough to conclude that the court acted reasonably in finding consent? You know the paragraph I'm talking about that's where she relates what happened that spring and summer? Yes. No, Your Honor, that is not. Okay, well that's fair enough. I just want to know what your argument is. Considering the circumstances and the subject matter of the Hague application being the parental rights into children, we would concede that consent must be clear and not alluded to or alleged based on allegations of one party. There was no clear act of the father to say that he consented to the children remaining in Germany. In fact, his actions upon finding out were quite contrary to consent. He immediately sought counsel to file a Hague application and also simultaneously pursued a custody complaint in Onslow County, North Carolina. All actions of a party who obviously would not have consented to their children remaining in a foreign country. I have a very few moments if there's any other questions from the bench at this time. Okay. You've got some rebuttals reserved. Yes, Your Honor. Okay. Mr. Webb. Good morning and may it please the Court. My name is Thurston Webb and I'll be representing the petitioner, Danielle Spencer. The purpose of the Hague Convention is to prevent parents from crossing international boundaries in search of a more sympathetic court. In light of that purpose, this Court has set comedy at the heart of the Hague Convention. Here, Mark, the father, asks this Court to ignore that purpose, to refuse to grant comedy to the German Court's decision, to essentially re-litigate the German Court's decision and to find a more favorable rule. Now, Mark essentially makes three arguments on appeal. First, he argues that the German Court wrongly applied the Hague Convention by failing to decide habitual residence. However, as Mark's attorney just consented, that wouldn't matter. The Hague Petition in Germany would have had no different conclusion, even if the Court had found habitual residence. Indeed, if you look at Article 13, habitual residence does not apply at all in that application. I think it's important to recognize that the Hague Convention itself doesn't really set forth a road map on how things are supposed to be done, and more sets out principles. Now, it's clear that if the Court actually decided or made an Article 3 determination, yes, habitual residence is important. But there's nothing in Article 13 that actually requires that. Now, second, Mark's attorney argues that the German Court decision itself failed to meet a minimum standard of reasonableness. Now, I would urge this Court to go back and actually read the German Court's opinion all throughout. If you read the entire thing, it's clear that what the mother actually testified to was she said, I had made the decision before, and then I agreed with Mark that I would actually further consider that decision. Indeed, Mark told her before that, hey, if you don't actually change your mind, I will then try to move to Germany. And when she went to Germany and called Mark and said, I'm not moving back, it wasn't the first time Mark had heard that. It was more a statement of, I've decided not to change my mind. Now, third, Mark argues the German Court erred by finding acquiescence. Well, the District Court here actually said that the German Court did not make any ruling based on acquiescence. And in fact, acquiescence did happen in this case. After the German Hague petition went through its proceedings, there was a divorce proceeding in Germany. And in that divorce proceeding, Mark agreed to allow the German Court to determine custody. And at no point since then has Mark gone back and actually tried to change the custody determination. He could if he wants. But she didn't get custody, did she? It was joint custody, wasn't it? It was joint custody, yes, Your Honor. All right, so that doesn't advance the ball, does it? I think, well, as other courts have interpreted acquiescence, one way to acquiesce to the children staying in another country is if you allow that other country's courts to decide custody. Here, Mark allowed the German courts to decide custody based on, and granted jointly to both the mother and the father. What about the round-trip plane ticket? Isn't that some indication that Mr. Smedley did not consent to their permanent move to Germany? I disagree. I think it actually fits quite nicely with Daniela's story. Two points on that. First, as it says in the record, a round-trip ticket was actually cheaper than buying a one-way ticket. And second, as Daniela said, she said she would allow or she would agree to reconsider her decision once she got over there. By Mark actually agreeing to, or by Mark buying a round-trip ticket, he left open that possibility just in case Daniela had actually reconsidered her decision. Well, didn't, I thought that we were just, the record just relies on Daniela's testimony about a round-trip ticket being more expensive. Is there evidence to support that in the record? Not that I'm aware, Your Honor. That was the evidence that was before the German court. And she also testified that in front of the district court here, too. That raises a concern I did have about the negative credibility determinations that the German court seemed willing to make against a party who wasn't present, perhaps through no fault of his own. Well, excusing his presence, when Mark, his attorney, first came forward, he told his attorney to say, I didn't find out about this, about her not coming back until, I think it was August 10th, based on a Facebook post. Daniela then presented as evidence a Facebook message that Mark had sent her a week or two before. And after she presented that Facebook message, the court granted a recess of sorts and allowed Mark to rebut that. And he came back and he said, yes, actually I knew about that before the time that I originally stated. So what the German court said is that based on that, and based on the fact that the children themselves actually corroborated all their mother's testimony, we don't find the father's testimony credible. If there are no further questions, I'm going to ask the court to affirm the district court. Do I have Mr. Humphrey? Briefly, Your Honors. Expanding on the issue of consent, you've heard evidences in front of you that there was no clear decision on anyone's part as to, even taken at face value and at best, of all the evidence, there was no clear decision on anyone's part as to what would be the final outcome of this trip to Germany for the German court to later decide unilaterally. Well, I think fairly. I have her testimony right here in front of me. But I think fairly. She says basically she decided to separate and go back to Germany and to take the children. And he tried to persuade her differently. And that was her decision when she went, that she was going to go back and separate and keep the children in Germany. But she did allow that she would consider his request and give him a final decision after she got there. According to that agreement, she did give him the final decision. And she said that that agreement with Mark, that she would give him that final decision, was followed by Mark's assertion that if that's what she decided, then he would try to come over to Germany to be near the children. And that would be consent, wouldn't it? If that were the fact. Yeah, but that's what she testified to, right? Correct. Okay. We contend that that was not the situation. And what do we have to rebut that? Well, let me back up a step there. I can't agree with that entirely in the sense that it would appear that her communications to Mark upon a revisit of the issue, to me, would reopen the question of consent at that point. If she had made up her mind and she said, I'm going and this is it, and he said, you're good to go, and they leave, he consented. If she goes under the auspice that, I'm not really sure what I'm going to do, I'll think about it when I get over there and then I'll call you. She didn't say that. Instead, I told him I'm separating, that I'm going to Germany and taking the kids, and he tried to persuade him. And what she agreed with him is to leave open the decision and let him know. And he agreed to that. And as part of his agreement, in the event I decided to stay in Germany, Mark told me that he would quickly try to be relocated so he could be as close as possible to the children. Under that circumstance, then Mark's consent would have been consent to her to go to Germany and then revisit the issue in July, not for her to remain permanently. Well, that was her intent in the beginning. I'm separating from you. In fact, they separated in February, three months before, or several months before the trip to Germany. Well, we contend that that didn't happen either. Well, that's in the court filing by your client in the divorce proceeding. At 39G of the record. I'm sorry, Your Honor. I was thinking of the... The divorce proceedings of the German court? If there were divorce proceedings under the German court, then that would have been at the behest of... The defendant has confirmed to me that he and his wife have been separated since February 2011. Well, I'm not sure, Your Honor, that was as part of the German decision. My understanding was that, aside from that, consent to allow one's children to leave a country permanently is not a decision that one can take lightly or make lightly and should not be reviewed lightly. And there should be clear and convincing evidence that... Is that the standard under German law? Under German law? What's the standard for reviewing a finding of consent? You're saying that it should be clear and convincing, and I'm just asking, is that the evidentiary standard that we apply? The standard of this court would be to review the Haig ruling for one of the three or more of the three items that I had discussed in my previous argument was that it meets minimum reasonableness or... Mr. Humphrey, I'm only trying to clarify what you said, that a finding of consent should be based on clear and convincing evidence. The Walker case, Walker v. Walker, said that, if I'm correct, is that the evidence of consent... You can answer the question. Again, I don't have the case in front of me, but if I'm not mistaken, that consent was something that was an objective thing that a court would determine, whereas acquiescence would have been something that could be inferred from behavior. But consent has to be a positive or objective action on the part of the... Well, how does that become clear and convincing? I misspoke there. Okay. Thank you. We'll come down in Greek Council and proceed on to the last case.
judges: Paul V. Niemeyer, Allyson K. Duncan, Stephanie D. Thacker